IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: VILLAGE ROADSHOW ENTERTAINMENT GROUP USA, INC., *et al.*,<br><br>　　　　　Debtors. | :<br>:<br>:<br>:<br>: | Chapter 11<br>Case No. 25-10475 (TMH)<br>(Jointly Administered) |
| WARNER BROTHERS ENTERTAINMENT, INC.,<br><br>　　　　　Appellant,<br>　　v.<br><br>VILLAGE ROADSHOW ENTERTAINMENT GROUP USA, INC., *et al.*,<br><br>　　　　　Appellees. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Civ. No. 25-1405-CFC |

# MEMORANDUM

This appeal arises in the chapter 11 cases of Village Roadshow Entertainment Group USA, Inc. and certain of its affiliates (together, the "Debtors") in connection with the appeal of the Bankruptcy Court's order, dated November 12, 2025 (Bankr. D.I. 1043) (the "Sale Order") approving the Debtors' sale of certain derivative rights, as governed by contracts to be assumed and assigned to successful bidder Alcon Media Group, LLC ("Alcon"), over the objection of appellant and contract counterparty Warner Bros. Entertainment Inc. ("Warner Brothers"), for the reasons set forth in *In re Village Roadshow Entm't Group USA, Inc.*, 2025 WL 3093845 (Bankr. D. Del. Nov. 5, 2025) (the "Memorandum Opinion"). Before the Court is

Warner Brothers' emergency motion (D.I. 6) (the "Stay Motion") seeking an order from this Court staying the effect of the Sale Order pending Warner Brothers' appeal.

Warner Brothers argues that the Bankruptcy Court erred in approving the sale of the derivative rights to Alcon because the contracts governing those rights: (i) are non-assignable financial accommodations, (ii) are personal service contracts which are non-assignable without consent, and/or (iii) Alcon has not provided adequate assurance of future performance. D.I. 6, 10, 11, 46. The Stay Motion is opposed by the Debtors and Alcon. D.I. 41, 43. At the urging of Warner Brothers, on November 26, 2025, I have issued an order temporarily staying the Sale Order and have considered the relief requested in the Stay Motion on an expedited basis. For the reasons set forth herein, I will deny the Stay Motion.

**Background**

The following background appears undisputed. Warner Brothers is a film studio that finances, produces, and distributes motion pictures. Warner Brothers historically has worked with other studios and investors to finance its films and seeks out such co-financing to mitigate the risk of loss in the event that a film underperforms. *In re Village Roadshow,* 2025 WL 3093845 at *5; Warner Brothers

App'x[1] 1 (2014 Motion Picture Rights Purchase Agreement ("2014 MPRPA")[2] at 9 (describing the purpose as being for a purchase of rights).) Beginning with the 1998 film *Practical Magic*, Warner Brothers and the Debtors co-financed over 90 theatrical motion pictures. (App'x 19 ("Smith Decl.") ¶ 9.) For each co-financed picture, Warner Brothers and Debtors entered into a "Rights Purchase Agreement" and a "Co-Ownership Agreement." (*Id.* ¶ 13.) The Co-Ownership Agreements provide the terms under which Debtors and Warner Brothers may exploit the derivative work (*e.g.*, create sequels or remakes) based on the previously co-financed films. (*Id.* ¶ 20; *see also, e.g.,* App'x 8 (*Wonka* Co-Ownership Agreement).)

The Co-Ownership Agreements were amended in 2017 and 2020 (together, the "Omnibus Amendments"). (Warner Brothers App'x 3.) As relevant here, the Co-Ownership Agreements, as amended by the Omnibus Amendments (collectively, the "Assumed Contracts"), are the only contracts to be assumed and assigned to Alcon under the Sale Order. (Warner Brothers App'x 24 ("APA"), Annex II.)

---

[1] Citations to "Warner Brothers App'x" are references to the appendix (D.I. 8) of exhibits submitted by Warner Brothers, and citations to "App'x" are references to the appendix (D.I. 44) of exhibits jointly submitted by the Debtors and Alcon. The transcript of the derivative rights sale hearing is located at Warner Brothers App'x 25 ("10/20/25 Tr.") and Warner Brothers App'x 26 ("10/21/25 Tr.").
[2] The 2014 MPRPA is the last agreement between Debtors and Warner Brothers contemplating the co-financing of non-derivative works. The 2014 MPRPA was amended and restated in 2020 (the "2020 MPRPA") and expired on December 31, 2020.

The Assumed Contracts provide Warner Brothers with sole discretion as to whether to produce derivative works. (App'x 19 ¶ 22.) The Debtors have a right to co-finance a derivative project, at their option, after receiving a "Project Notice" from Warner Brothers. (*Id.* ¶ 23; App'x 11 ¶ 9.) If the Debtors accept a project notice within fifteen days of receiving it, Warner Brothers fronts all production and marketing costs for the project, including the Debtors' share of such costs. The Debtors then must repay Warner Brothers for their share of the production costs if and when the project is ultimately released. This financing arrangement makes sense because, under the terms of the Assumed Contracts, Warner Brothers retains complete creative control over a derivative project. (10/20/25 Tr. at 65:3-17.) Thus, even after the Debtors accept a Project Notice, Warner Brothers retains full discretion regarding whether to proceed with production of the derivative work. (*See id.*) The Assumed Contracts therefore never require Warner Brothers to produce derivative works or make any related capital expenditures.

The parties to the Assumed Contracts were all corporate entities, and the contracts contain no provision identifying any specific individuals at Warner Brothers or Debtors with unique skills who must render services under the agreements. (*Id.* 222:3-12.) Additionally, projects exploiting the derivative rights governed by the Assumed Contracts may occur decades after the original films were released, notwithstanding significant turnover in personnel at both Warner Brothers

3

and Debtors in the interim. (*See e.g.*, App'x 3 (project notice for sequel to the first co-financed film, 1998's *Practical Magic*, first emailed in 2025)); 10/20/25 Tr. at 146:16-147:10, 222:13-223:5 (identifying executives who have left Debtors and Warner Brothers).)

Alcon was founded in 1997, and is now one of the oldest independent film studios in the world. (App'x 21 at ¶ 4.) The majority of Alcon's films have been distributed by Warner Brothers as part of a decades-long business relationship that continues to this day. (*Id.* ¶ 8.) Warner Brothers has served as the distributor on twenty-nine Alcon films and has advanced funds for or co-financed five Alcon films. (*Id.*; 10/20/25 Tr. 130:1-8.) Alcon never breached any obligation to Warner Brothers under their arrangements in their nearly thirty years of business together, nor has Alcon ever breached confidentiality regarding Warner Brothers' sensitive information. (*Id.* at 224:22-225:16-19.)

In a completely unrelated matter, Alcon initiated a lawsuit against Warner Brothers in October 2024 (the "Tesla litigation") to protect its intellectual property from infringement by an AI tool, which was used to recreate an iconic image from one of Alcon's films. (*Id.* 136:6-137:3; App'x 21 ¶ 20.) Throughout their long business relationship, this has been the sole lawsuit between Alcon and Warner Brothers. (*Id.*)

In the chapter 11 cases, the Debtors sought to sell three sets of assets: (i) the

film library, including Debtors' share of future revenue from such films (the "Library Assets"); (ii) Debtors' studio business (the "Studio Assets"); and (iii) the derivative rights in the films that Debtors co-financed, including Debtor's relevant copyright interests and the Assumed Contracts (collectively, the "Derivative Rights Assets"). (App'x 6.) The sale procedures were approved by the Bankruptcy Court on April 24, 2025. (*Id.*) Ultimately, Alcon was the successful bidder for all three sets of assets, and Warner Brothers was declared the back-up bidder. (Warner Brothers App'x 11.)

Warner Brothers objected to the sale of the Derivative Rights Assets to Alcon, discovery was taken, and an evidentiary hearing was held. Seven witnesses testified live, and one witness testified by deposition designations. (*Id.* 10/20/25 Tr. at 4-5, 62:1-9.)

On November 5, 2025, the Bankruptcy Court issued its Memorandum Opinion approving the sale of the Derivative Rights. The Bankruptcy Court carefully considered and rejected each of Warner Brothers' objections to the sale, concluding that the Assumed Contracts were not financial accommodations or personal services contracts and that Alcon had made a sufficient showing of adequate assurance of future performance, among other things. *See In re Village Roadshow,* 2025 WL 3093845 at *5-8. On November 12, 2025, the Bankruptcy Court issued the Sale Order. On November 18, 2025, Warner Brothers filed a

5

Notice of Appeal and an Emergency Motion for Stay Pending Appeal. (Warner Brothers App'x 29, 30.) The Bankruptcy Court heard and denied Warner Brothers' motion on November 24, 2025. (App'x 27 ("Stay Hearing").)

**Jurisdiction**

Appeals from the Bankruptcy Court to this Court are governed by 28 U.S.C. § 158. District courts have mandatory jurisdiction to hear appeals "from final judgments, orders, and decrees." 28 U.S.C. § 158(a)(1). The Sale Order is a final, appealable order. *In re Culp,* 550 B.R. 683, 691 (D. Del. 2015).

**Discussion**

"The granting of a motion for stay pending appeal is discretionary with the court." *In re Trans World Airlines, Inc.*, 2001 WL 1820325, at *2-3 (Bankr. D. Del. Mar. 27, 2001). "[A] stay of a Court's decision is an 'extraordinary remedy.'" *In re W.R. Grace & Co.*, 475 B.R. 34, 205 (D. Del. 2012) (citations omitted). "The movant bears the burden of establishing that imposition of a stay is warranted." *David v. Weinstein Co. Holdings, LLC*, 2021 U.S. Dist. LEXIS 49063, at *6 (D. Del. Mar. 16, 2021).

Courts in the Third Circuit follow *Revel* and the "sliding-scale approach." *In re Revel AC, Inc.*, 802 F.3d 558, 568-70 (3d Cir. 2015). This approach considers:

> (1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the

>other parties interested in the proceeding; and (4) where the public interest lies.

*Id.* at 568. "'[T]he most critical' factors," according to the Supreme Court, are the first two: "whether the stay movant has demonstrated (1) a strong showing of the likelihood of success and (2) that it will suffer irreparable harm." *In re Revel AC*, 802 F.3d at 568 (quoting *Nken v. Holder,* 556 U.S. 418, 434 (2009)); *see also In re Strong*, 2018 U.S. Dist. LEXIS 24022, at *8-9 (D. Del. Feb. 14, 2018). The movant must make a "sufficient showing" on the first two factors before the court proceeds to "balance the relative harms considering all four factors using a 'sliding scale' approach." *Revel*, 802 F.3d at 571. If the movant fails to make such a sufficient showing, the stay should be "denied without further analysis." *Id.*

**Likelihood of success on appeal**

The first *Revel* factor requires Warner Brothers to make "a strong showing that it is likely to succeed on the merits" by demonstrating "a reasonable chance, or probability, of winning." *Id.* at 568-71. Warner Brothers has not made that showing here.

Warner Brothers argues first that it is likely to succeed on the merits because the Assumed Contracts are financial accommodations that are unassignable under 11 U.S.C. § 365(c)(2). That section bars the assignment of an executory contract in a bankruptcy if:

>such contract is a contract to make a loan, or extend other

7

> debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor[.]

11 U.S.C. § 365(c)(2). Warner Brothers says that because the Assumed Contracts require Warner Brothers to pay all costs of derivative projects up front and require the Debtors to later reimburse Warner Brothers for those costs with interest if the project is completed, the contracts are in effect loans or financial accommodations.

A contract, however, is not a loan or financial accommodation under § 365(c)(2) if its "extension of credit is merely incidental to the broader contractual arrangement involving the debtor." *In re Sportsman's Warehouse, Inc.*, 457 B.R. 372, 392-93 (Bankr. D. Del. 2011). "The statute asks whether the contract *as a whole* is a 'financial accommodation,' not whether one clause could be so characterized." *In re United Airlines*, 368 F.3d 720, 724 (7th Cir. 2004) (emphasis added). And the Assumed Contracts, read as whole, are not financial accommodations. As the Bankruptcy Court correctly observed, the Assumed Contracts' "purpose [wa]s not for Warner Bro[thers] to provide financing to the Debtors, but for the Debtors to provide financing to Warner Bro[thers] to mitigate the risk (or share in the profit) of [particular] project[s]." *In re Village Roadshow*, 2025 WL 3093845 at *5 (footnotes omitted). In other words, the contracts served as an investment vehicle for Debtors and a means of financing and mitigating risk for Warner Brothers.

Warner Brothers next argues that the Assumed Contracts "are so personal in

8

nature that they cannot be assigned absent Warner Brothers' consent under applicable California law incorporated by 11 U.S.C. § 365(c)(1)." D.I. 6 at 6. Under § 365(c)(1), when an executory contract cannot be assigned under applicable non-bankruptcy law, it may not be assigned in bankruptcy without permission of the other contracting party. 11 U.S.C. 365(c)(1). The parties agree that California law is the applicable nonbankruptcy law, and that under California law "contracts involving relationships of personal confidence and trust or personal services are not assignable by either party without the consent of the other party." *In re Village Roadshow*, 2025 WL 3093845 at *6 (citations omitted). I agree with the Bankruptcy Court that the Assumed Contracts are not personal services contracts and do not involve relationships of personal confidence and trust. To the contrary, the Assumed Contracts involve corporate, not personal relationships; have existed for many years and are contemplated to exist without regard to the owners, managers, or employees of the contracting parties; and do not involve non-delegable personal services.

Finally, Warner Brothers argues that Alcon has failed to provide it with adequate assurance of future performance. As the Bankruptcy Court explained, § 365(f)(2)(B) provides that a debtor seeking to assign an executory contract must provide "adequate assurance of future performance by the assignee of such contract." *Id.* at *7 (citing 11 U.S.C. § 365(f)(2)(B) and *Cinicola v.*

9

*Scharffenberger,* 248 F.3d 110, 120 (3d Cir. 2001)). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *In re Carlisle Homes, Inc.,* 103 B.R. 524, 538 (Bankr. D.N.J. 1988). The primary focus of determining whether an assignee has given adequate assurance of future performance is "the assignee's ability to satisfy the financial obligations imposed by the [contract]." *In re Evelyn Byrnes, Inc.,* 32 B.R. 825, 829 (Bankr. S.D.N.Y. 1983). Non-financial obligations, while "less significant," may also be considered. *Id.*

Warner Brothers argues that the Bankruptcy Court "improperly extrapolated from Alcon's past and potential future ability to upsize its capital availability," rather than "consider the evidence demonstrating that Alcon is now highly leveraged, without any existing commitments to cover the financing at issue." D.I. 6 at 6-7. The record reflects that Alcon presented uncontroverted evidence regarding its current liquidity, ability to close, track record of successful funding, and ability to raise more funds if needed. (App'x 21 ¶¶ 28-32, 38; 10/20/25 Tr. at 119:20-120:12; 121:9-14; 122:6-9; 125:9-18.)

Warner Brothers does not argue that the Bankruptcy Court applied an incorrect standard and points to nothing in the record to show that any of these findings were clearly erroneous. Warner Brothers argues that the unrelated Tesla litigation between Alcon and Warner Brothers is an indication that Alcon cannot

10

provide adequate assurance. Warner Brothers offers no authority for its argument that unrelated litigation is a factor to be considered in assessing adequate assurance for an executory contract. The only authority Warner Brothers cites for its contention that adequate assurance considers an "ability to maintain a healthy relationship" is a single case involving unique facts. D.I. 6 at 28 (citing *In re Texas Health Enters.*, 246 B.R. 832, 836 (Bankr. E.D. Tex. 2000)).) In particular, that case involved a nursing home where the court's concern was "the negative effects of the poor relationship between the parties must *affect the welfare of the nursing-home residents* to some degree." *Id.* (emphasis added).

As noted, the Tesla litigation concerns infringement of Alcon's intellectual property by an AI tool. (10/20/25 Tr. at 136:11-137:3.) Warner Brothers presented no evidence at the hearing as to how the unrelated Tesla litigation could impact Alcon's performance under the Assumed Contracts. The evidence at the sale hearing also showed that Warner Brothers itself has not viewed the Tesla lawsuit as any impediment to a contractual relationship with Alcon. The Tesla litigation was filed in October 2024. (10/20/25 Tr. at 136:6-9.) In June of 2025, while the Tesla litigation was pending, Warner Brothers and Alcon (at Warner Brothers' request) entered into a distribution agreement for a number of Alcon films. (App'x 9, 15, 21 ¶ 14.)

### Irreparable harm in the absence of a stay

To determine "whether the applicant will be irreparably injured absent a stay[,]" *Revel*, 802 F.3d at 568, courts in the Third Circuit look for "harm that cannot be prevented or fully rectified by a successful appeal." *Strong*, 2018 U.S. Dist. LEXIS 24022, at *9. To satisfy the second *Revel* factor, "the applicant must 'demonstrate that irreparable injury is *likely* not merely possible in the absence of a stay.'" *Revel*, 802 F.3d at 569 (internal alterations omitted) (emphasis in original). "To establish irreparable harm, a stay movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent." *Id.* at 571 (internal quotation marks and citation omitted).

"[A] purely economic injury, compensable in money, cannot satisfy the irreparable injury requirement[.]" *Minard Run Oil Co. v. United States Forest Serv.*, 670 F.3d 236, 255 (3d Cir. 2011). I agree with Alcon that purely economic injuries include situations where, as here, the movant will still have its contract, which will be enforceable post-assumption and assignment in total against the new purchaser. In those situations, a movant has suffered a purely economic harm because monetary damages and state law remedies will be available to the movant in the event that the purchaser fails to fulfill any obligation that it has under the contract.

Warner Brothers advances two arguments: (1) that if there is no stay pending appeal, Warner Brothers will be forced into a contractual relationship with Alcon

requiring the sharing of "sensitive" information; and (2) in the absence of a stay, consummation of the Sale will statutorily moot the appeal. D.I. 6 at 30-33. Neither of these alleged circumstances is sufficient to warrant the extraordinary remedy of a stay pending appeal. First, Warner Brothers' complaint about being forced into a contractual relationship with Alcon rings hollow, as Warner Brothers and Alcon have been contractual counterparties in the film industry for decades and still are today. (App'x 21 ¶¶ 8-21.) As for Warner Brothers' specific complaint about being forced to share sensitive information, Warner Brothers makes no showing that sharing information with Alcon is any risk to Warner Brothers. The only evidence on this point in the record is the testimony of a Warner Brothers' witness that over the course of their decades-long relationship, Alcon never breached confidentiality regarding Warner Brothers' sensitive information. (10/20/25 at 225:16-19 (Q: "Well, in your experience with Alcon, has Alcon ever breached confidentiality with regard to sensitive information in their dealings with [Warner Brothers]? [Wayne Smith:] I'm not aware of any.").)

Second, courts in this district have repeatedly held that the possibility of statutory mootness does not constitute irreparable harm for purposes of obtaining a stay. *See e.g., Winters Nursery LLC v. Color Spot Holdings, Inc.*, 2018 U.S. Dist. LEXIS 141221, at *11 (D. Del. 2018) ("the possibility that an appeal may become moot does not alone constitute irreparable harm for purposes of obtaining a stay").

This is true even if "the Court denies a stay pending appeal and the sale closes before a determination of the[] appeals, [meaning] § 363(m) may preclude the Court of Appeals from unwinding the sale." *Caliber North Dakota, LLC v. Nine Point Energy Holdings, Inc.*, No. 21-972, Mem. Op. at 9 (D. Del. Aug. 4, 2021).

## Conclusion

Warner Brothers has failed to demonstrate "a reasonable chance, or probability, of winning" on the merits or that it will suffer irreparable harm in absence of a stay. Accordingly, no further analysis is required. *In re Revel AC*, 802 F.3d at 571 ("If the movant does not make the requisite showings on either of these first two factors, the inquiry into the balance of harms and the public interest is unnecessary, and the stay should be denied without further analysis.") (cleaned up). The Court will issue a separate Order consistent with this Memorandum.

December 23, 2025

                                                    Colm F. Connolly
                                                    Chief Judge